UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| JACKSON COUNTY EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, )<br>)<br>)<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>ORACLE CORPORATION, SAFRA A. )<br>CATZ, CLAYTON M. MAGOUYRK, )<br>MICHAEL D. SICILIA, DOUGLAS )<br>KEHRING, and LAWRENCE J. ELLISON, )<br>)<br>Defendants. )<br>)<br>) | Civil Action No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff Jackson County Employees' Retirement System ("plaintiff"), on behalf of itself and all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of Oracle Corporation ("Oracle" or the "Company"), the Company's press releases, analyst reports, media reports, and other publicly disclosed information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a securities class action on behalf of all purchasers of Oracle securities between June 12, 2025 and December 16, 2025, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act") against Oracle and certain of the Company's executive officers.

## JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

3.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b), and §27 of the 1934 Act, because certain of the events or omissions giving rise to the claim occurred in this District, including the dissemination of the alleged false and misleading statements into this District.  In addition, Oracle has been involved in a multi-year effort to move its corporate headquarters to Nashville, Tennessee, and its current Co-Chief Executive Officer ("CEO") Clayton M. Magouyrk resides in this District.

4.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

5.    Plaintiff Jackson County Employees' Retirement System, as set forth in the certification attached hereto and incorporated by reference herein, purchased Oracle securities during the Class Period and has been damaged thereby.

6.	Defendant Oracle Corporation is a multinational technology company that has been in the process of moving its corporate headquarters to Nashville since 2021. The Company is currently constructing its worldwide headquarters along the East Bank of Nashville's riverfront. Oracle common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ORCL."

7.	Defendant Safra A. Catz ("Catz") served as Oracle's CEO, its Principal Executive and Financial Officer, and a member of the Company's Board of Directors (the "Board") until September 22, 2025. After September 22, 2025, defendant Catz became the Executive Vice Chair of the Board.

8.	Defendant Clayton M. Magouyrk ("Magouyrk") has served as Oracle's Co-CEO and a member of the Board since September 22, 2025. Defendant Magouyrk served as President, Oracle Cloud Infrastructure prior to this time.

9.	Defendant Michael D. Sicilia ("Sicilia") has served as Oracle's Co-CEO and a member of the Board since September 22, 2025. Defendant Sicilia served as President, Oracle Industries prior to this time.

10.	Defendant Douglas Kehring ("Kehring") has served as Oracle's Executive Vice President ("EVP"), Principal Financial Officer since September 22, 2025. Defendant Kehring served as Oracle's EVP of Operations prior to this time.

11.	Defendant Lawrence J. Ellison ("Ellison") co-founded Oracle and served as its Chief Technology Officer ("CTO") and Executive Chairman of the Board during the Class Period.

12.	Defendants Catz, Magouyrk, Sicilia, Kehring, and Ellison are collectively referred to herein as the "Individual Defendants."

13. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, partners, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

14. As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and trade on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, partners, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Oracle securities would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity

to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## BACKGROUND

16. Oracle is one of the largest technology companies in the world. Founded in 1977, the Company became a leading purveyor of multi-model database management systems. Over the decades, Oracle has grown to provide a wide array of products and services related to its customers' enterprise information technology ("IT") needs. Oracle's IT models include enterprise applications and infrastructure offerings deployed on premises or through cloud-based and hybrid models.

17. Oracle operates three business segments: (i) Cloud & License; (ii) Hardware; and (iii) Services. Oracle's largest and most important business segment is Cloud & License, which accounted for $49.2 billion, or 86%, of Company revenues during its fiscal 2025.[1] Oracle's Cloud & License business engages in the sale and marketing of applications and infrastructure technologies, including: (i) cloud services offerings; (ii) cloud license and on-premise license offerings; and (iii) license support offerings.

18. Oracle's cloud services offerings accounted for roughly half of Oracle's total Cloud & License business revenues in fiscal 2025. Oracle's cloud services are divided into Oracle Cloud Applications ("OCA") and Oracle Cloud Infrastructure ("OCI"). OCA offerings, sometimes denoted by the Company as cloud "software-as-a-service" or "SaaS" offerings, include Oracle software applications delivered via a cloud-based IT environment that the Company's customers purchase by entering into a subscription agreement with Oracle for a set period. OCI offerings, sometimes denoted by the Company as "infrastructure as a service" or "IaaS" offerings, provide Oracle's

---

[1] Oracle's fiscal year ends on May 31 of the calendar year. Thus, Oracle's fiscal 2025 ended on May 31, 2025.

customers with infrastructure technologies and services such as compute, storage, and networking services and include specialized database offerings tailored to meet specific customer needs.

19. Leading up to and during the Class Period, Oracle executives claimed that the Company was capitalizing on an historic business opportunity as a key provider of the critical infrastructure used to power the development and deployment of artificial intelligence ("AI") technology. Company executives highlighted hundreds of billions of dollars' worth of new business that Oracle had purportedly procured from the central players in an ongoing "AI revolution." As a result, Oracle claimed that its remaining performance obligations ("RPOs") had ballooned to $455 billion during its fiscal quarter ended August 31, 2025, *up 230%* from just one quarter prior, while its quarterly OCI revenues had surged 55% year-over-year. Due to these and similar representations by defendants, the price of Oracle common stock reached all-time highs of over $345 per share by mid-September 2025.

20. Unbeknownst to Oracle's outside investors, however, the Company's claimed hyperbolic growth had come at an astronomical cost. Oracle needed to spend tens of billions of dollars more than what defendants had revealed to investors in order to develop the infrastructure necessary to meet this demand, impairing the Company's formerly solid balance sheet, depleting its cash flows, eroding its margins, requiring massive capital raises, increasing its borrowing costs, and fundamentally altering the risk profile of the Company. These concealed risks were further magnified by the fact that most of Oracle's recently claimed RPO increases were attributable to a single customer: OpenAI. OpenAI boasted a novel technology – a proprietary large language model ("LLM") powering OpenAI's generative AI chatbot ChatGPT – but the company was not profitable and only generated a fraction of the revenue needed to make its promised payments to Oracle, let alone OpenAI's numerous infrastructure commitments to other counterparties (totaling over $1

trillion).  In order to secure these hoped-for payments, Oracle needed to make tens of billions of dollars' worth of new capital expenditures (including an estimated $50 billion in fiscal 2026 alone) and enter into more than $200 billion in additional long-term lease commitments.

21.     As the truth was belatedly revealed, the price of Oracle securities plummeted in value, causing plaintiff and the Class (defined herein) to suffer losses and economic damages under the federal securities laws.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

22.     The Class Period begins on June 12, 2025.  After market hours on June 11, 2025, Oracle issued a release announcing the Company's financial results for its fourth fiscal quarter and fiscal year ended May 31, 2025 ("FY25 Release").  The release stated that during the fourth quarter Oracle's total revenue had increased 11% to $15.9 billion, its cloud revenue had increased 27% to $6.7 billion, its OCI revenue had increased 52% to $3 billion, and its RPOs had increased 41% to $138 billion.  The release also stated that Oracle had $21.2 billion in capital expenditures for the fiscal year (compared to $6.9 billion in fiscal 2024) and a negative free cash flow of approximately $400 million (compared to a positive $11.8 billion free cash flow during Oracle's fiscal 2024).

23.     Defendant Catz was quoted in the release as highlighting Oracle's tremendous OCI growth, stating:

> "FY25 was a very good year – but we believe FY26 will be even better as our revenue growth rates will be dramatically higher . . . .  We expect our total cloud growth rate – applications plus infrastructure – will increase from 24% in FY25 to over 40% in FY26.  Cloud Infrastructure growth rate is expected to increase from 50% in FY25 to over 70% in FY26.  And RPO is likely to grow more than 100% in FY26.  Oracle is well on its way to being not only the world's largest cloud application company – but also one of the world's largest cloud infrastructure companies."

24.     Defendant Ellison was similarly quoted in the release touting "'skyrocketing'" OCI demand, stating:

"MultiCloud database revenue from Amazon, Google and Azure grew 115% from Q3 to Q4 . . . . We currently have 23 MultiCloud datacenters live with 47 more being built over the next 12 months. We expect triple-digit MultiCloud revenue growth to continue in FY26. Revenue from Oracle Cloud@Customer datacenters grew 104% year-over-year. We have 29 Oracle Cloud@Customer dedicated datacenters live with another 30 being built in FY26. Overall Oracle Cloud Infrastructure consumption revenue grew 62% in Q4. We expect OCI consumption revenue to grow even faster in FY26. OCI revenue growth rates are skyrocketing – so is demand."

25. That same day, Oracle held an earnings call hosted by defendants Catz and Ellison to discuss its fiscal year 2025 results with analysts and investors. During her prepared remarks, defendant Catz stated that Oracle's capital expenditures, or "CapEx," during fiscal 2026 would be "over $25 billion" to meet robust client infrastructure demands and spur "further accelerat[ing]" profit and revenue growth, stating:

The vast majority of our CapEx investments are for revenue-generating equipment that is going into data centers and not for land or buildings. I expect that FY26 CapEx will be higher at over $25 billion as we work to meet demand from our backlog. As we bring more capacity online, our revenue and profit growth will further accelerate.

26. During the question-and-answer portion of the call, an analyst asked about Oracle's unexpectedly high capital expenditures during the quarter and how confident the Company was that $25 billion "is the right number for this year." In response, defendant Catz stated that the costs "may" end up over this figure as the Company was spending to meet client "orders" and robust demand, but she maintained the $25 billion benchmark, stating:

The reality is that, as I mentioned on the call, our CapEx is usually about equipment. We're not – we have building partners who charge us rent once they finish constructing things. And when we all of a sudden have higher CapEx, it means we are filling out data centers and we are buying components to build our computers, which are different than other people, and we are putting them on the floor.

We had an opportunity to buy up and for deployment, and so we did, and we are putting out as much capacity as we possibly can as quickly as we can. I do believe that the $25 billion next year may turn out to be understated. So it is all to meet demand. We don't order, we don't build unless we've got orders for our capacity to be built out. And we have so much in orders right now that I actually

expect – I believe I said on the call, over $25 billion this next quarter. And that is, again, to match demand.

27. Defendant Ellison added that the Company was "doing a bunch of things to lower our CapEx costs," but nonetheless "CapEx is going to go up because the demand right now seems almost insatiable," stating:

> Let me add – we recently got an order that said we'll take all the capacity you have, wherever it is. It could be in Europe, it could be an Asia, we'll just take everything. I mean we might not order like that before. The – we had to move things around, and we did the best we could to give them the capacity they needed. The demand is astronomical.
>
> We have to – but we have to do this methodically. The reason demand continues to outstrip supply is, we can only build these data centers, build these computers so fast. And we're also doing a lot of engineering around high-speed networking. You'll see us making – we are making large engineering investments to speed up the networking, the reliability of the network and lower the cost of the networking. So we're doing a bunch of things – we are doing a bunch of things to lower our CapEx costs.
>
> But even if we do that, CapEx is going to go up because the demand right now seems almost insatiable. I mean I don't know how to describe it. I've never seen anything remotely like this. I mean people are calling up and asking us, please, can you find us more capacity. We'll take it wherever it's in Malaysia, we'll take it – fine. We'll take it there. We got some wherever.

28. On June 18, 2025, Oracle filed with the SEC its fiscal 2025 annual report on Form 10-K, which was signed by defendants Catz and Ellison, as well as other Oracle officers and directors. Defendant Catz also filed separate attestations to the report's material accuracy and completeness. The Form 10-K contained the statements regarding Oracle's fiscal year 2025 revenues, capital expenditures, cash flows, and RPOs contained in the FY25 Release. In addition, the Form 10-K stated: "We believe that our current cash, cash equivalents and marketable securities balances, cash generated from operations and our borrowing arrangements will be sufficient to meet our working capital, capital expenditures and contractual obligations requirements." The Form 10-K further stated that Oracle had "$43.4 billion of additional lease commitments, primarily for data

centers, that are generally expected to commence between fiscal 2026 and fiscal 2028 and for terms of ten to sixteen years that were not reflected on our consolidated balance sheet as of May 31, 2025 or in the maturities table above."

29. On June 30, 2025, Oracle filed with the SEC a current report on Form 8-K (the "June 2025 Form 8-K"). In the June 2025 Form 8-K, defendant Catz was quoted as stating: "'Oracle is off to a strong start in FY26. Our MultiCloud database revenue continues to grow at over 100%, and we signed multiple large cloud services agreements including one that is expected to contribute more than $30 billion in annual revenue starting in FY28.'"

30. On September 9, 2025, Oracle issued a release announcing the Company's financial results for its first fiscal quarter ended August 31, 2025 ("1Q26 Release"). The release stated that during the quarter Oracle's total revenue had increased 12% to $14.9 billion, its cloud revenue had increased 28% to $7.2 billion, its OCI revenue had increased 55% to $3.3 billion, and its RPOs had increased 359% to $455 billion. The release further stated that Oracle had $8.5 billion in capital expenditures for the quarter (compared to $2.3 billion in the comparable prior year period) and a four-quarter trailing negative free cash flow of approximately $5.8 billion (compared to a positive $11.3 billion free cash flow in the comparable prior year period).

31. Defendant Catz was quoted in the release as highlighting Oracle's accelerating OCI growth, stating:

> "We signed four multi-billion-dollar contracts with three different customers in Q1 . . . . This resulted in RPO contract backlog increasing 359% to $455 billion. It was an astonishing quarter – and demand for Oracle Cloud Infrastructure continues to build. Over the next few months, we expect to sign-up several additional multi-billion-dollar customers and RPO is likely to exceed half-a-trillion dollars. The scale of our recent RPO growth enables us to make a large upward revision to the Cloud Infrastructure portion of Oracle's overall financial plan which we will be presenting in detail next month at the Financial Analyst Meeting. As a bit of a preview, we expect Oracle Cloud Infrastructure revenue to grow 77% to $18 billion this fiscal year – and then increase to $32 billion, $73 billion, $114 billion, and $144 billion

over the subsequent four years. Most of the revenue in this 5-year forecast is already booked in our reported RPO. Oracle is off to a brilliant start to FY26."

32. Defendant Ellison was similarly quoted in the release as emphasizing the historic business opportunity purportedly benefitting Oracle as a central player in the AI revolution, stating:

"MultiCloud database revenue from Amazon, Google and Microsoft grew at the incredible rate of 1,529% in Q1 . . . . We expect MultiCloud revenue to grow substantially every quarter for several years as we deliver another 37 datacenters to our three Hyperscaler partners, for a total of 71. And next month at Oracle AI World, we will introduce a new Cloud Infrastructure service called the 'Oracle AI Database' that enables our customers to use the Large Language Model of their choice – including Google's Gemini, OpenAI's ChatGPT, xAI's Grok, etc. – directly on top of the Oracle Database to easily access and analyze all their existing database data. This revolutionary new cloud service enables the tens of thousands of our database customers to instantly unlock the value in their data by making it easily accessible to the most advanced AI reasoning models. Oracle AI Cloud Infrastructure and the Oracle MultiCloud AI Database will both contribute to dramatically increasing cloud demand and consumption over the next several years. AI Changes Everything."

33. That same day, Oracle held an earnings call hosted by defendants Catz and Ellison to discuss its first fiscal quarter 2026 results with analysts and investors. During her prepared remarks, defendant Catz stated that, given Oracle's "RPO growth, I now expect fiscal year '26 CapEx will be around [$]35 billion." She continued by highlighting how these investments would purportedly lead to "accelerating revenue and profit growth," stating:

As a reminder, the vast majority of our CapEx investments are for revenue-generating equipment that is going into the data centers and not for land or buildings. As we bring more capacity online, we will convert the large RPO backlog into accelerating revenue and profit growth.

34. During the question-and-answer portion of the call, an analyst asked for more information about the Company's increased capital spending plans and the expected return on those investments. In response, defendant Catz downplayed the costs and risks to Oracle, stating that the buildout was relatively cheap, able to generate revenue quickly, and "asset pretty light," stating:

First of all, as I mentioned in the prepared remarks and as I've said very clearly beforehand, we do not own the property. We do not own the buildings. What we do

own and what we engineer is the equipment. That's equipment that is optimized for the Oracle Cloud.

It has extremely special networking capabilities. It has technical capabilities from Larry and his team that allows us to run these workloads much, much faster. And as a result, it's much cheaper than our competitors, depending on the workload.

Now, because of that, what we do is we put in that equipment only when it's time and usually very quickly. Assuming that our customer accept it, we're already generating revenue right away. The faster they accept the system and that it meets their needs, the faster they start using it, the sooner we have revenue.

This is, in some ways, I don't want to call it asset light from the finance world, but it's asset pretty light. And that is really an advantage for us. I know some of our competitors, they like to own buildings. That's not really our specialty. Our specialty is the unique technology, the unique networking, the storage, just the whole way we put these systems together.

By the way, they are identical and very simplified; and again, making it possible for us to be very profitable while still being able to offer our customers an incredibly compelling price.

35. Defendant Catz continued by stressing that Oracle's capital expenditures would be $35 billion for the year and, although there was a possibility the spend "could be a little higher," that would only be because the Company had added capacity to meet rapacious client demand, stating:

What I have indicated is that CapEx looks like it's going to be about $35 billion for this fiscal year. But because we're monitoring this, we're literally putting it in right when we take possession and then, handing it over to generate revenue right away.

So we have a very good line of sight for our capabilities to put this out and basically to just spend on that CapEx right before it starts generating revenue. But at this point, I'm looking at $35 billion for the year. And I think – it could be a little higher but I think – and if it is higher, it's good news because it means more capacity has been handed over to me in terms of floor space.

As you also know, we are embedded in our competitors' cloud. Again, all we are responsible for to pay for is, in fact, our equipment, and that goes right away. There, we're moving ultimately to 71 data centers embedded in our competitors/partners.

36. Defendant Ellison further downplayed cost concerns, adding that Oracle was able to turn its data centers over to customers extraordinarily fast, allowing the Company to generate

revenue quickly, and that the Company generally received superior financing options that lowered its costs, stating:

> Let me add a couple of very short things. One is we just turned over a giant data hall to one of our customers. The acceptance time could have been as long as a couple of months.

> It was one week. It was one week from the time we officially owned the equipment and they were testing it to the time they started paying for it.

> One week. So we have an extraordinary team that's doing an extraordinary job of making sure that we get the equipment working very quickly. And our customers can accept it, they want to accept it as fast as possible because they want to do the work, they want to train their models. And this one took a huge hall, took one week for acceptance. It was extraordinary that.

> The other we are a very large consumer of networking equipment, GPUs, et cetera. Because we are a very large consumer, we are able, I think, to get better financing terms from the vendors than some of their people.

> So I think we have that going for us as well. I think we're going to do very well on the finance side. We have advantages there as well.

37. On September 10, 2025, Oracle filed with the SEC its quarterly report on Form 10-Q for its first fiscal quarter of 2026, which was signed by defendant Catz, who also filed separate attestations to the report's material accuracy and completeness. The Form 10-Q contained the statements regarding Oracle's first quarter 2026 revenues, capital expenditures, cash flows, and RPOs contained in the 1Q26 Release. In addition, the Form 10-Q stated: "We believe that our current cash, cash equivalents and marketable securities balances, cash generated from operations and our borrowing arrangements will be sufficient to meet our working capital, capital expenditures and contractual obligations requirements." The Form 10-Q further stated that Oracle had "$99.8 billion of additional lease commitments, substantially all for data centers, that are generally expected to commence between fiscal 2026 and fiscal 2028 and for terms of ten to sixteen years that were not reflected on our condensed consolidated balance sheets as of August 31, 2025."

38. Also on September 10, 2025, *The Wall Street Journal* reported that Oracle and OpenAI had signed a $300 billion cloud deal, which it described as "one of the largest cloud contracts ever." The article reported that Oracle had given a "first hint of the deal" when the Company had disclosed the large cloud services agreement described by defendant Catz in the June 2025 Form 8-K.

39. On September 25, 2025, Oracle filed with the SEC a prospectus on Form 424B2 for the public sale of $18 billion worth of senior notes (the "Note Offering"), which expressly incorporated the Company's fiscal 2025 and first fiscal quarter of 2026 periodic SEC filings but failed to disclose the true costs of the Company's AI-related infrastructure buildout.

40. On October 16, 2025, Oracle held a Financial Analyst Meeting at its Oracle AI World conference hosted by defendants Magouyrk, Sicilia, Ellison, and Kehring, among other Oracle executives. During his prepared remarks, defendant Magouyrk highlighted how cheaply and efficiently Oracle was purportedly expanding its ability to service AI-related infrastructure demand, stating:

> So now I want to talk a bit more about AI infrastructure. So when I talk about AI infrastructure, AI means many different things. Here, I'm really talking about companies that want accelerators for either doing training or reasoning, both fit into this category.
>
> We have a lot of these customers, right? If you take a look here, when we say there's more than 700 of these customers consuming on our platform, that doesn't mean there's 700 customers using AI, just to be clear, right? You hear Mike talk about it. We have thousands and thousands of customers using AI on our platform.
>
> This is people who show up and go, "No, I want some type of accelerated computing, whether it be an NVIDIA GPU or an AMD GPU or as we're rolling out different accelerators, any type of accelerated hardware, that's all we're counting for you to fit into this category.
>
> This, as you can imagine, is growing very rapidly, right? 117% year-over-year growth and overall annualized consumed revenue. The margin is different. And the reason for the margin range here is less to do with product mix because in

general, these customers actually are pretty well defined on which types of products they want.

A lot of it comes down to the location and how efficient we can be. – So as an example, as we continue to be more and more efficient, as we can go in and design better networks, so we can optimize our data center build-out, as we can do things like power capping, that then allows us to have a higher margin.

And in some cases, the other part of the reason for the margin range is, obviously, just like I talked about with cloud natives, there's customers of different sizes, right? Typically, these customers are relatively large to begin with, although there's a lot of very small ones, but they can scale extremely high, as I think all of you know. Okay.

So why they're picking OCI? Well, part of it is, is that we move very quickly. We move quickly when things are stood up, but we also move even more quickly before things exist. So our ability to rapidly deliver the latest and the accelerators. Networking matters a lot, right?

Fundamentally, when people are buying a cluster, like yes, the actual accelerator matters, but all of these workloads are operating in a clustered fashion. That's true across training, especially, but even for inferencing, all of these inferencing is happening at a cluster level.

And then the fact that we actually have extremely efficient data center designs that allow us to optimize our power usage, which then translates into more – either more power available for them or lower costs. And then it's not enough to just be really good at compute and networking. Storage is also critically important because these clusters are doing something with data, whether that be for training runs or for inferencing, they need access to a huge amount of context for these models to be valuable.

41. Later during the presentation, defendant Sicilia added to defendant Magouyrk's comments regarding Oracle's "unmatched" value proposition in its OCI buildout, stating:

So you've heard us say throughout the event here that AI changes everything. And I think what's really important to understand is that, for all the reasons Clay just described, for everything that we're doing in OCI, our ability to deliver AI to our customers embedded inside of our application stack and the ability to have just an unbelievable time to value, we think is unmatched.

42. Defendant Kehring similarly stated: "The demand we are seeing is really hard to comprehend. To put it in perspective, our RPO balance is up nearly 10 times since fiscal year 2022. Clearly, the customer demand is strong, but it's also enduring." Based on this purported demand,

defendant Kehring stated that Oracle was on track to achieve $225 billion in annual revenue by fiscal 2030. Defendant Kehring continued:

> This represents a CAGR of over 31% over the next five years. Our pipeline is very deep, and we could see more large-scale opportunities signed over the next 12 months, which could change this forecast and outlook further. And in terms of profit growth, we forecast reaching $21 of EPS by fiscal year 2030. This represents a CAGR of 28% over the next five years, consistent with my comments that revenue and profits are symbiotic. These figures are stunning with both revenue and EPS growing nearly 4 times over the next five years.

43. In providing a snapshot of Oracle's purported growth trajectory, defendant Kehring assured investors: "We pay careful attention to our cash flow, our debt ratings, our debt capacity and the various funding mechanisms that are at our disposal. These all factor into how we strategically grow revenue and profits faster."

44. The statements referenced in ¶¶22-37, 39-43 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them, including:

(a) that Oracle's revenue and RPO growth related to its provision of AI-related infrastructure and related services would cost tens of billions of dollars more than revealed to investors and require the Company to take on hundreds of billions of dollars in additional long-term lease commitments;

(b) that, as a result of (a) above, the Company would need to raise tens of billions of dollars in additional capital, thereby diluting Oracle investors, increasing the Company's borrowing costs, and degrading the Company's balance sheet; and

(c) that, as a result of (a)-(b) above, Oracle's AI-related infrastructure business had materially lower profit margins and was substantially more risky, with a materially lower likelihood of success, than defendants had portrayed to investors.

45. Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

46. The failure of Oracle's periodic SEC filings to disclose the true costs and adverse impacts to Oracle's business resulting from its pivot to servicing AI-related infrastructure demands violated Item 303 and rendered statements in Oracle's SEC filings materially misleading, because these undisclosed facts were known to defendants and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations. This failure also violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in Oracle securities speculative or risky. Indeed, the risk disclosures contained in Oracle's periodic SEC filings were themselves materially misleading, presenting potential, future contingent risks as mere possibilities (*e.g.*, "our business may be adversely affected if . . . infrastructure costs to deliver new or enhanced products and services take longer or result in greater costs than anticipated"), while concealing known cost increases and their attendant adverse impacts and risks to Oracle that had *already* occurred and were expected to occur, especially when read in conjunction with the numerous affirmative misrepresentations regarding the purported benefits of Oracle's AI-related infrastructure business growth detailed herein.

47. Then, on December 10, 2025, Oracle issued a release revealing the Company's financial results for its second fiscal quarter ended November 30, 2025 ("2Q26 Release"). The release revealed that Oracle's capital expenditures had ballooned to $35.5 billion over the trailing four quarters, *more than three times greater* than Oracle's $10.7 billion in capital expenditures in the comparable prior year period. Meanwhile, Oracle's four-quarter trailing negative free cash flow had more than *doubled* sequentially to negative $13.2 billion. During the related earnings call, defendant Kehring revealed that Oracle actually expected capital expenditures far greater than previously revealed to meet demand for its AI-related infrastructure services – including *$50 billion* in fiscal 2026 alone, an amount roughly double the $25 billion benchmark provided to investors at the beginning of the Class Period.

48. The next day, Oracle filed with the SEC a quarterly report on Form 10-Q for its second fiscal quarter of 2026 revealing that the Company's additional lease obligations had also risen dramatically. Specifically, the Form 10-Q disclosed that Oracle "had $248 billion of additional lease commitments, substantially all related to data centers and cloud capacity arrangements, that are generally expected to commence between the third quarter of fiscal 2026 and fiscal 2028 and for terms of fifteen to nineteen years that were not reflected on our condensed consolidated balance sheets as of November 30, 2025."

49. On this news, the price of Oracle common stock declined over $33 per share, or 15%, over two trading days, from $223.01 per share at market close share on December 10, 2025 to $189.97 per share at market close on December 12, 2025, on abnormally high trading volume, wiping out tens of billions of dollars in shareholder value.

50. On February 1, 2026, Oracle revealed a new financing plan to fund its rapidly growing OCI business. Specifically, Oracle stated that it expected to raise $45 billion to $50 billion

in calendar 2026 in order to build additional capacity to meet the contracted demand from its largest OCI customers, including OpenAI, through tens of billions of dollars in debt and equity financing.

51. As adverse information about the true costs and risks of Oracle's AI-related business were revealed to the market, the price of Oracle common stock has continued to fall, dropping to a low of just $135.25 per share by February 5, 2026 – *60% below* Class Period highs of more than $345 per share – and causing plaintiff and the Class to suffer significant financial losses and economic damages under the federal securities laws.

## ADDITIONAL SCIENTER ALLEGATIONS

52. As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated during the Class Period to the investing public in the name of the Company, or in their own name, were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Oracle, and their control over and/or receipt and/or modification of Oracle's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

53. Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. Accordingly, the fraud described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

54. The Individual Defendants, because of their positions with Oracle, controlled the contents of Oracle's public statements during the Class Period. The Individual Defendants were

each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, nonpublic information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the defendants is responsible for the accuracy of Oracle's corporate statements and is, therefore, responsible and liable for the representations contained therein.

55. In addition, the Individual Defendants were each personally involved in the development of Oracle's AI-related infrastructure offerings, including the development's affiliated costs and expenses, and held themselves out to the market as the Oracle executives most knowledgeable and competent to speak on such topics. Specifically, defendant Ellison served as the Company's CTO during the Class Period and was intimately involved in the Company's pivot to an AI-infrastructure provider. Similarly, defendant Catz was uniquely situated as both the Company's CEO and its Principal Accounting Officer leading up to and during the Class Period, while defendant Magouyrk served as President of Oracle Infrastructure and defendant Sicilia served as President of Oracle Industries before they both transitioned to Co-CEO roles during the Class Period. Defendant Kehring, meanwhile, served as a top Oracle financial executive.

56. Oracle's ability to service AI-related infrastructure demand was the most pressing issue facing the Company during the Class Period, and given their roles at the Company each of the Individual Defendants would have been intimately involved in securing OCI demand; planning, operationalizing, deploying, and maintaining Oracle's AI infrastructure services; and/or financial planning and financing related to the Company's AI-related business, operations, and strategic

initiatives. The Individual Defendants not only routinely spoke about such topics as persons with knowledge about them during the Class Period, but they affirmatively confirmed as much in their presentations to investors. For example, during a September 9, 2025 earnings call, defendant Catz represented that she and other Oracle executives "have a very good line of sight for our capabilities to put this out and basically to just spend on that CapEx right before it starts generating revenue." Defendants also personally benefitted from the fraud, selling Oracle securities at artificially inflated prices during the Class Period, including in the Note Offering.

57. Taken together and in context, there is a compelling inference that each defendant knew, or was reckless in not knowing, of their statements' materially false and misleading nature at the time each statement was made that is at least as compelling as any non-culpable inference.

## CLASS ACTION ALLEGATIONS

58. Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased Oracle securities during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

59. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, shares of Oracle common stock were actively traded on the NYSE and other Oracle securities were also actively traded. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Oracle or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice

similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

60.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

61.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

62.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether defendants' statements during the Class Period were materially false and misleading;

(b)     whether defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(c)     the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

63.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**LOSS CAUSATION**

64.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Oracle securities and

operated as a fraud or deceit on Class Period purchasers of Oracle securities by failing to disclose and misrepresenting the adverse facts detailed herein. When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Oracle securities declined significantly as the prior artificial inflation came out of the price of the stock, as detailed herein. As result of their purchases of Oracle securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICATION OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

65. At all relevant times, the market for Oracle securities was an efficient market for the following reasons, among others:

(a) Oracle common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, national stock market;

(b) as a regulated issuer, Oracle filed periodic public reports with the SEC;

(c) according to the Company's Form 10-Q for the fiscal quarter ended February 28, 2026 filed with the SEC on March 11, 2026, Oracle had over 2.8 billion shares of common stock outstanding as of March 5, 2026;

(d) Oracle regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e) unexpected material news about Oracle was rapidly reflected in and incorporated into prices for shares of Oracle securities during the Class Period.

66. As a result of the foregoing, the market for Oracle securities promptly digested current information regarding Oracle from all publicly available sources and reflected such

- 23 -

information in the price of the stock. Under these circumstances, all purchasers of Oracle securities during the Class Period suffered similar injury through their purchases of Oracle securities at artificially inflated prices and a presumption of reliance applies.

67. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on defendants' material misstatements and/or omissions. Because this action involves defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

68. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Oracle who knew that those statements were false when made.

## COUNT I

### For Violation of §10(b) of the 1934 Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

69.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

70.    During the Class Period, the defendants named herein disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

71.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

      (a)    employed devices, schemes, and artifices to defraud;

      (b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      (c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Oracle securities during the Class Period.

72.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Oracle securities.  Plaintiff and the Class would not have purchased Oracle securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

73. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Oracle securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

74. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

75. During the Class Period, the Individual Defendants acted as controlling persons of Oracle within the meaning of §20(a) of the 1934 Act. By virtue of their positions and their power to control public statements about Oracle, ownership of Oracle stock, and relationships with the Company, the Individual Defendants had the power and ability to control the actions of Oracle and its employees.

76. Oracle controlled the Individual Defendants and all of its other officers and employees.

77. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff, and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  March 27, 2026

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD (BPR #032977)


                          s/ Christopher M. Wood
                    CHRISTOPHER M. WOOD

200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2203
cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
bcochran@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
srudman@rgrdlaw.com

VANOVERBEKE, MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
tmichaud@vmtlaw.com

Attorneys for Plaintiff

- 28 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Jackson County Employees' Retirement System ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5.  Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Jastram v. NextEra Energy, Inc.*, No. 9:23-cv-80833 (S.D. Fla.)
*In re Illumina, Inc. Sec. Litig.*, No. 3:23-cv-02082 (S.D. Cal.)

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __27__ day of March, 2026.

Jackson County Employees' Retirement System

By: _____
James Shotwell, Chairperson

ORACLE

# SCHEDULE A

## SECURITIES TRANSACTIONS

**Common Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 06/18/2025 | 269 | $211.99 |
| 06/24/2025 | 124 | $214.91 |
| 06/25/2025 | 129 | $213.58 |
| 06/26/2025 | 134 | $213.29 |
| 07/29/2025 | 171 | $250.88 |
| 09/11/2025 | 488 | $316.69 |
| 09/12/2025 | 273 | $293.14 |
| 09/15/2025 | 100 | $301.47 |
| 09/24/2025 | 98 | $305.87 |
| 09/25/2025 | 98 | $294.50 |
| 09/30/2025 | 104 | $279.91 |
| 10/17/2025 | 107 | $292.97 |
| 10/20/2025 | 93 | $276.41 |
| 10/24/2025 | 210 | $283.05 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 11/13/2025 | 447 | $219.17 |
| 11/14/2025 | 187 | $222.07 |
| 12/01/2025 | 148 | $201.62 |
| 12/12/2025 | 185 | $191.37 |
| 12/16/2025 | 150 | $188.14 |

Prices listed are rounded to two decimal places.

*Opening position of 778 shares.